IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA M. MOLINA, | ) | Case No. 1:17-cv-01492 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

### I.     Introduction

Plaintiff, Maria M. Molina, seeks judicial review of the final decision of the Commissioner of Social Security denying her application child insurance benefits and supplemental security income under Titles II and Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supported the ALJ's RFC determination, I recommend that the final decision of the Commissioner be AFFIRMED.

### II.    Procedural History

Molina applied for child insurance benefits ("CIB") based on disability on January 12, 2015. (Tr. 28)  Molina also filed an application for supplemental security income on July 5, 2014. (*Id.*)  In both applications, Molina alleged a disability onset date of May 14, 2013. (*Id.*)  Molina alleged disability based on open heart surgery, bad nerves, and kidney problems. (Tr.

180)  After Molina's applications were denied initially and on reconsideration (Tr. 28), she filed a written request for a hearing.  (*Id.*)  Administrative Law Judge William Leland ("ALJ") heard the case on March 14, 2016 (Tr. 40-69) and denied Molina's claims on May 4, 2016.  (Tr. 22)  The Appeals Council denied further review on May 19, 2017, rendering the ALJ's May 4, 2016, decision the final decision of the Commissioner.  (Tr. 1-3)

Molina now seeks review, arguing that the ALJ erred in finding Molina could perform sedentary work.

**III.  Evidence**

Because Molina raises only limited issues, it is unnecessary to summarize the entire record.

    **A.  Personal, Educational and Vocational Evidence**

Molina was 39 years old on the date of the administrative hearing.  (Tr. 249)  Molina finished the ninth grade in Puerto Rico.  (Tr. 49)  Molina worked for a time when she was 14 or 15, left her position, and has not worked since.  (Tr. 51).  The ALJ found Molina had no past relevant work.  (Tr. 33)

    **B.  Medical Records Related to Molina's Impairments**

Molina has a history of congenital heart defect, had open heart surgery, and had a metal device placed in her body when she was six years old.  (Tr. 213, 384, 504)  The metal device used for the open heart surgery "pushed up and out of her chest" and Molina had to have another surgery to push it back in.  (Tr. 213).  Molina has had one or more ventral hernias since age two.  (Tr. 385, 499)  She developed a hernia at the bottom of her midline sternotomy incision after she underwent a cardiac procedure.  (Tr. 499)  Her abdominal hernia sometimes caused nausea, vomiting, and pain, especially when lifting things or wearing a bra.  (Tr. 385, 499)

Molina sought emergency treatment for abdominal pain and kidney stones four times between July and September 2014. (Tr. 415-66) Doctors gave her Pyridium, Motrin/Tylenol for her pain, and magnesium citrate for constipation. (Tr. 416)

On October 1, 2014, Molina began receiving primary care medical services at Lorain County Health and Dentistry. (Tr. 384) Molina reported abdominal pain, but did not report constipation, diarrhea, or vomiting. (Tr. 386) On examination, Virginia Brugger, CNP found Molina had abdominal tenderness and was positive for having a hernia. (Tr. 387) Her heart had a regular rate and rhythm and no murmurs, gallops, or rubs. (Tr. 387) Nurse Brugger referred Molina to general surgery for evaluation and treatment of the hernia. (Tr. 379)

A transthoracic echocardiography procedure performed on October 9, 2014 showed that Molina's left ventricular ejection fraction was estimated at 50% and she had atypical IVS wall motion due to her post-operative status. (Tr. 393) There was trace mitral valve regurgitation and mild tricuspid valve regurgitation. (*Id.*) The cardiovascular testing results were otherwise normal. (*Id.*)

On October 31, 2014, cardiologist Theodore R. Pacheco, M.D. performed a preoperative risk assessment for Molina's ventral hernia repair. (Tr. 396) Molina complained of sharp discomfort in her chest that was aggravated by stretching her arms and back, cold weather, and lying flat. (*Id.*) Molina reported no nausea, vomiting, or abdominal pain. (*Id.*) On examination Dr. Pacheco found normal S1/S2, regular heart rate and rhythm, and no S3/S4, murmur, rub, or heave. (Tr. 397) Dr. Pacheco noted that Molina had not had a cardiology follow up since age 12. (Tr. 398) He also noted Molina was asymptomatic except for chest discomfort that was most consistent with musculoskeletal/surgical scarring. (*Id.*) Dr. Pacheco noted Molina had no exertional symptoms and no significant murmurs. (*Id.*) Dr. Pacheco concluded Molina was

stable from a cardiac standpoint and that it was an acceptable risk to proceed with the proposed surgery. (Tr. 389)

On November 10, 2014, an x-ray of Molina's chest showed that her heart appeared normal, lungs appeared clear, and the visualized bony thorax and remainder of the chest appeared unremarkable. (Tr. 698) The examining physician found there was no radiographic evidence of active disease in Molina's chest. (*Id.*)

On March 3, 2015, surgeon John A. Costin III, M.D. performed a laparoscopic repair of Molina's incarcerated incisional hernia. (Tr. 557) On May 28, 2015, Molina reported constant, hard, right upper abdominal pain, which radiated to her back. (Tr. 553) Dr. Costin found Molina's surgical wound was healing well, but found she was tender in the right lateral and upper abdomen. (*Id.*)

Molina went to the emergency room twice in April 2015 for flank pain and kidney stones and once in June 2015 for vaginal pain and kidney stones. (Tr. 559-83, 661-81) A medical service provider found no change in the range of motion in the affected area, no gait or transfer limitations, and that Molina ambulated without aid. (Tr. 559) On examination, Molina's musculoskeletal system and extremities were non-tender, had normal range of motion, and no pedal edema or calf tenderness. (Tr. 561) She had a regular heart rate, rhythm, and heart sounds and no gallops, rubs, murmurs, or edema. (*Id.*) A CT scan of Molina's abdomen and pelvis showed a kidney stone, mild nonspecific subcutaneous edema or inflammation of the midline upper abdomen at the site of the hernia mesh, and no evidence of abscess. (Tr. 582-83)

On June 5, 2015, Molina sought emergency treatment for left flank pain and painful burning with urination. (Tr. 678) An x-ray of Molina's abdomen showed nonobstructive bowel gas, and mild levolumbar scoliosis, but no kidney stone. (Tr. 674) The physician interpreting

4

the x-ray noted no acute process within Molina's abdomen.  (*Id.*)  The doctor prescribed ibuprofen and Flomax.  (Tr. 679)

On July 28, 2015, Sheri Kershaw, CNP examined Molina regarding her scoliosis and kidney stones.  (Tr. 621)  Molina requested a "referral to therapy for SSI to evaluate for disability" and asked for SSI paperwork to be completed.  (*Id.*)  On examination, the nurse found Molina's cervical spine was misaligned, but all other findings were normal.  (Tr. 624)

On September 3, 2015, Molina obtained emergency treatment for lower abdominal pain and kidney stones.  (Tr. 647-53)

Molina underwent physical therapy twice a week for five weeks during the period from October 2015 to December 2015.  (Tr. 476-85)  Molina reported that she was applying for Social Security disability benefits.  (*Id.*)  She reported mid and low back pain, inconsistent numbness and tingling in her legs and feet, and rated the severity of the pain at seven to eight out of ten.  (*Id.*)  The physical therapist found pain upon palpation at the thoracic-lumbar paraspinals, tenderness, and slightly antalgic gait pattern.  (Tr. 478)  Molina reported that she was independent in self-care, feeding, grooming, bathing, dressing, and home tasks.  (*Id.*)  At the end of the treatment, Molina reported improved mobility in her upper thoracic spine and rated the pain at six out of ten.  (Tr. 484)

On December 14, 2015, Molina reported vertigo, right knee pain, and that she was diagnosed with scoliosis.  (Tr. 616)  On examination, all systems were normal, except there was tenderness in Molina's cervical, thoracic, and lumbar spine, and swelling in her right knee.

On February 22, 2016, Molina reported that she was seeking Social Security disability benefits for scoliosis.  (Tr. 607)  On examination, Molina displayed reduced overall cervical and

5

lumbar lordosis, thoracic kyphosis, mild scoliotic curvature, and standing pelvic tilt. (Tr. 609) Her gait was compensated and fluid. (*Id.*)

      **C.    Opinion Evidence**

          **1.    Dariush Saghafi, MD – State Agency Consultative Examiner**

On September 4, 2014, Dariush Saghafi, M.D. examined Molina (and spoke to her in Spanish). (Tr. 369) Molina reported that when she sought treatment for her bloating and acid reflux, medical providers had told her to take antacids and "to simply watch her diet." (*Id.*) Molina reported that she would have a hard, painful abdominal protrusion or mass, vomiting, and nausea whenever she "exerts any type of force greater than lifting 5 lbs." (*Id.*) She reported that she would have to go to the hospital to receive IV medications to reduce the abdominal mass. (*Id.*)

Dr. Saghafi found Molina was in no acute distress. (Tr. 370) Her heart had normal S1 and S2 heart sounds, and there were no murmurs, thrills, gallops, or audible evidence of regurgitation. (*Id.*) He found no evidence of palpable masses or rebound tenderness in Molina's abdomen, but he did find bloating with pain on palpation in all quadrants. (*Id.*) Dr. Saghafi found Molina had normal tone and bulk for her age in both her upper and lower extremities and +5/5 strength in all muscles examined. (Tr. 370-71) Her reflexes were +2/4 globally in upper and lower extremities. (Tr. 371) Her gait and arm swing were normal. (*Id.*)

Dr. Saghafi opined Molina likely suffered from a moderate to moderately severe form of irritable bowel syndrome that prevented her from working due to extreme pain and the need for hospitalization. (*Id.*) Dr. Saghafi stated that when Molina exerted more than five pounds of lifting pressure or force, she would get abdominal muscle cramping and protrusion of what is likely an intestinal obstruction secondary to spasms that can only be relieved by going to the hospital and having IV medication placed. (*Id.*) Dr. Saghafi opined that Molina was able to lift,

push, and pull sufficiently to be able to perform activities of daily living, but otherwise could not lift more than 5 lbs. (*Id.*) He opined that Molina was a poor candidate for manual labor, but could "work at a purely clerical type position where no lifting of more than 5 lbs. Were [*sic*] required." (*Id.*)

### 2. Barb Adkins, Physical Therapist, and Sheri Kershaw, CNP

On August 18, 2015, physical therapist Barb Adkins assessed Molina's physical functional capacity. (Tr. 471) Molina reported she was independent with self-care, including dressing and bathing, and home management. (*Id.*) The physical therapist found Molina had tightness and pain in her hip flexor, but normal range of motion and 4+/5 strength in all other joints. (Tr. 471-72) She also noted thoracic scoliosis. (Tr. 473) Adkins opined Molina had "good lift and carry tolerance for [the] light physical demand level." (*Id.*) She opined Molina could lift and carry 20 lbs. occasionally, 5-10 lbs. frequently, and frequently stoop and occasionally balance. (Tr. 474) Barb Adkins opined that the following problem could interfere with Molina's vocational performance, decreased: trunk strength, lower extremity range of motion, trunk motion, lift and carry tolerance, knowledge and application of body mechanics with lifting tasks, standing tolerance, sitting tolerance, and knowledge and application of appropriate pain management. (Tr. 473-74) She found Molina did not demonstrate validity of effort and did not demonstrate maximal effort with the grip and pinch testing. (Tr. 473-74)

### D. Testimonial Evidence

### 1. Claimant's Testimony

At the March 14, 2016 hearing an interpreter translated the proceedings into Spanish for Molina's benefit. (Tr. 42) Molina testified that she did not know how to read or write in English. (Tr. 50) Molina attended school in Puerto Rico through the ninth grade. (Tr. 49) She was treated at the Cleveland Clinic or University Hospital in 1983 at age six and then returned to

Puerto Rico. (Tr. 49-50) Molina also lived in Connecticut, where she worked for a time when she was 14 or 15 before she "left" because she "couldn't be standing for all that long." (Tr. 51) Molina went to Ohio in 2014 or 2015 and lived with her niece. (Tr. 50)

Molina stated that she was unable to work because of her hernias, heart, and back and because her "legs stick out." (Tr. 52) She stated the herniated area gets inflamed when she strains or does some kind of action that requires force. (*Id.*) Molina testified that her hernias were operated on in March 2015 and she did not have any hernias at the time of the hearing. (Tr. 52-53) Molina stated she had a "metal small stick-like thing" that hurt her chest, especially when it was very cold. (Tr. 56) Molina said the metal device exited her chest one time and she had an operation in Puerto Rico to put it back and secure it with a stitch. (*Id.*) She said the metal device caused her a lot of pain when she moved her body in certain positions. (*Id.*) She stated she also experienced spasms one or two days a week, would have inflammation in her chest once a week, and was nauseous "constantly." (Tr. 57) She said she would also experience pain two or three times a week and/or would "take longer" when going to the bathroom. (Tr. 58)

Molina stated she could sit comfortably for 45 minutes, stand for slightly less time, and walk for an hour or more. (Tr. 53) Molina stated she could lift less than five pounds. (*Id.*)

Molina stated that her doctors were treating her with physical therapy and that she had last had physical therapy in November or December of 2015. (*Id.*) She stated that she stopped receiving treatment for generalized anxiety because "they didn't continue calling [her]." (Tr. 54) Molina said she had to arrange an appointment with her doctors regarding her heart condition. (*Id.*) Molina stated she was taking medication for her anxiety and pain, although the pills for her pain were not helping her at all and caused side-effects like nausea and vomiting. (Tr. 55)

8

Molina said she always goes grocery and clothing shopping with her niece, who drives and can communicate with store personnel. (Tr. 50) Molina did her household chores on her own, where possible, and her niece helped her with any chores she could not do. (Tr. 55)

### 2. Vocational Expert, Mark Anderson

The ALJ asked VE Mark Anderson a first hypothetical that asked whether an individual with the following limitations could perform any work: limited to light work; could frequently stoop, kneel, crouch, climb ladders, ropes, and scaffolds; and could occasionally crawl. (Tr. 60) The VE testified the hypothetical individual could work as a gluer, assembler of small products, or assembler of printed products. (Tr. 61) The ALJ then asked whether an individual with the same limitations from the first hypothetical plus the following limitations could perform any work: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; never to be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle; and "frequent exposure to extreme cold and extreme heat." (Tr. 61) The VE testified the second hypothetical individual could work as a table worker, dowel inspector, or patcher. (Tr. 61) The ALJ then asked whether an individual with the limitations described in the second hypothetical could perform any work, if the individual was also limited to lifting, carrying, pushing, or pulling up to five pounds. (Tr. 61-62) The VE testified that at five pounds, the individual would be less than sedentary and that would eliminate unskilled work. (Tr. 62) The ALJ asked the VE another hypothetical in which the hypothetical individual was limited to frequent interaction with supervisors, coworkers, and the public, and had the limitations from hypotheticals one and two. (Tr. 62) The ALJ stated his response would not change. (*Id.*) The ALJ also asked the VE whether an individual who would be off task more than twenty percent of an eight-hour workday, in addition to normal work breaks, and had the limitations from hypotheticals one, two, four, and five could perform any work. (Tr. 62) The

9

VE stated the hypothetical person who would be off task twenty percent would not be a competitive employee at the unskilled level. (Tr. 62-63)

## IV. The ALJ's Decision

The relevant portions of ALJ's May 4, 2016 decision can be paraphrased as follows:[1]

   2. Molina had not engaged in substantial gainful activity since June 1, 1983, the alleged onset date (20 C.F.R. 404.1571 *et seq*., and 416.971 *et seq*.). (*Id.*);

   3. Molina had the following severe impairments: ventral-abdominal hernias, status post ventricular septal defect repair, irritable bowel syndrome, scoliosis of lumbar and thoracic spine, kidney stones, and obesity (20 C.F.R. 416.920(c)) (*Id.*);

   6. After careful consideration of the entire record, the ALJ found that Molina had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except Molina could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. Further, Molina must never be exposed to unprotected heights, moving mechanical parts, must never operate a motor vehicle, and can only tolerate frequent exposure to extreme cold and extreme heat (*Id.*);

   8. Molina was born on April 27, 1976 and was 7 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963). (*Id.*);

   11. Considering Molina's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Molina can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)). (*Id.*)

Based on his twelve findings, the ALJ determined that Molina was not disabled from the alleged June 1, 1983 onset date through May 4, 2016, the date of his decision. (Tr. 38)

## V. Law & Analysis

### A. Standard of Review and Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

---

[1] I include only those findings relevant to the issue Molina has raised.

10

existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, she is not disabled.

2. If claimant is not doing substantial gainful activity, her impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents her from doing past relevant work. If claimant's impairment does not prevent her from doing his past relevant work, she is not disabled.

5. If claimant is unable to perform past relevant work, she is not disabled if, based on his vocational factors and RFC, she is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied, because, if not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. The ALJ Supported His RFC Determination with Substantial Evidence

Molina argues that the ALJ erred in finding that she had the RFC to perform sedentary work. ECF Doc. 15, Page ID# 782. Molina argues that because Dr. Saghafi opined Molina could not lift more than five pounds and because the ALJ gave Dr. Saghafi's opinion "considerable weight," Molina should have been excluded from sedentary work, which requires the ability to lift up to ten pounds. *Id.* In support, Molina points out that the VE testified that only being able to lift five pounds would be less than sedentary and would eliminate unskilled

13

work. *Id*. at 780 (citing Tr. 62).  Molina argues "[t]he administrative law judge appeared to accept a limitation to lifting five pounds (Tr. 32), but he makes the assumption that this is the equivalent of a regulatory definition of sedentary work." *See* ECF Doc. 15, Page ID 783-83.

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R §§ 404.1567 and 416.967.  The ALJ found that the opinion evidence supported a finding that Molina could perform sedentary work with minimal additional limitations.  (Tr. 32)  Thus, the crux of this dispute is whether the ALJ was wrong not to accept every part of consulting examiner, Dr. Saghafi's opinions.  Or to say it differently, did the ALJ have support in the record to conclude that Molina could lift more weight than Dr. Saghafi had opined.

Molina's own words are what the ALJ focused on.  Molina gave inconsistent statements about her ability to lift weight.  The ALJ noted that Molina alleged she could only lift ten pounds or less." (Tr. 31, 213)  And her own disability report appeal form stated her "hernia [wa]s very larg [*sic*] and very painful – prevents me from wearing bra – limited to lifting 10 pounds or less." (Tr. 213)  She also stated that she was "not able to do the things [she] could before, limited to lifting 10 pounds or less and [was] a nervous [*sic*] wreck."  (Tr. 216)  At the administrative hearing, Molina testified she could not "lift less than five pounds."  (Tr. 53)  When the ALJ asked if Molina could lift more than five pounds, she responded, "Well, a little bit, but not so much." (*Id.*)  During her evaluation with Dr. Saghafi, Molina reported that "[i]f she exerts any type of force greater than lifting 5 lbs. [then] she will have abdominal protrusion and the mass is 'rock hard and painful'" and she "will become nauseous and vomiting will ensue." (Tr. 369)  As discussed below, the ALJ found that Molina's statements concerning the intensity, persistence,

and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 31)

Dr. Saghafi opined that when Molina "exerts more than 5 lbs. [of] lifting pressure or force she gets abdominal muscle cramping as well as protrusion of what is likely an intestinal obstruction secondary to spasms and this can only be relieved by going to the hospital and having an IV medication placed."  (Tr. 371)  He opined Molina "is able to lift, push, and pull sufficiently to be able to perform ADL's otherwise, she cannot lift more than 5 lbs."  (*Id.*)  The ALJ gave "considerable" weight to Dr. Saghafi's opinion.  (Tr. 32)  The ALJ stated that Dr. Saghafi's opinion was "consistent with a sedentary residual functional capacity, and with other evidence that [Molina] can lift five pounds, and stand and walk with minimal limitations."  (*Id.* citing Tr. 474)  The ALJ noted that the finding that Molina could lift 5 lbs. was consistent with other opinion evidence, including Sheri Kershaw, CNP's opinion that that Molina could lift and carry 5-10 lbs. frequently and 20 lbs. occasionally.  (*Id.*)  However, the ALJ assigned little weight to Nurse Practitioner Kershaw's opinion, because it was inconsistent with other opinion evidence limiting Molina to sedentary work.  (Tr. 32-33)

The commissioner argues that "simply because the ALJ granted weight to Dr. Saghafi's opinion does not mean that he adopted the opinion entirely."  ECF Doc. 16, Page ID# 799.  I agree.  Even when an ALJ provides "considerable weight" to an opinion, there is no requirement that an ALJ adopt the expert's opinion's wholesale or verbatim.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  The ALJ's second and third hypotheticals to the VE indicate that the ALJ correctly understood that the sedentary exertion level requires the ability to life more than five pounds.  (Tr. 61-62)  In the second hypothetical, the ALJ referred to sedentary exertional limitations, but in the third hypothetical the ALJ modified the lifting and carrying

15

limitation to five pounds. (*Id.*) The commissioner argues "this line of questioning demonstrates that the ALJ considered both possibilities at the hearing, and, in the end, his RFC finding . . . shows that he decided the evidence did not support an additional limitation to lifting no more than five pounds. ECF Doc. 15, Page ID 800 (citing Tr. 31, 61-62). I agree and find the ALJ's analysis and questioning of the VE shows that he gave considerable weight to Dr. Saghafi's opinion that Molina had the ability to do sedentary work and lift five pounds, but the ALJ did not find that Molina could *only* lift five pounds or less.

Molina argues that there was no opinion evidence supporting the ALJ's determination that she could perform work at the sedentary level, because, with the exception of Dr. Saghafi's opinion, the ALJ gave "little weight" to all other opinion evidence. ECF Doc. 15, Page ID# 783 (citing Tr. 33). The RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2) and(3); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App' x 435, 442 (6th Cir. 2017). "[T]he Commissioner has final responsibility for deciding an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the [medical sources] the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (internal quotation marks and citations omitted). The ALJ was not required to base his determination on a medical opinion, and substantial evidence, including objective medical evidence and the claimant's own words, supported his decision. Molina's argument is without merit.[3]

---

[3] The administrative record reveals that Dr. Saghafi's 2014 examination and opinions were rendered before Molina's abdominal hernia repair occurred in March 2015. The ALJ was in the best position to keep this chronology in mind when not fully accepting the lifting limitation recommended by Dr. Saghafi. I do not offer this as a further ground to overrule Molina's claim because the ALJ didn't explicitly discuss

16

Molina also argues that abdominal and intestinal problems interfere with her ability to lift more than five pounds. ECF Doc. 15, Page ID# 783. However, the ALJ found Molina's activities of daily living and the medical evidence of record were inconsistent with her statements concerning the intensity, persistence, and limiting effects of her symptoms. (Tr. 31) The ALJ noted that Molina was able to do laundry, household cleaning, and cooking three times per day. (Tr. 32, 197) Molina also stated she could shop for 30 minutes or more. (Tr. 198) Molina also repeatedly told medical service providers that she was independent in self-care, including feeding, grooming, bathing, dressing, and home tasks. (Tr. 478, 514, 518, 526, 551, 555) The ALJ also found her statements regarding her symptoms inconsistent with the medical evidence as described below. (Tr. 32)

> Record evidence confirmed the claimant's diagnosis of kidney stones, with a CT of the claimant's abdomen revealed mild left hydronephrosis secondary to kidney stones ([Tr. 363; 582]). However, an x-ray of the claimant's abdomen revealed no acute processes were noted ([Tr. 674]). Treatment notes also confirmed the claimant had a congenital heart defect requiring repair via open heart surgery when she was six years old, but had not had cardiology follow up since age 12, and had no history of hypertension, hyperlipidemia, coronary artery disease, myocardial infarction, or rheumatic heart disease ([Tr. 504]). The claimant had no recent emergency visits or hospitalization, and overall, the claimant was stable from a cardiac standpoint, with no angina, clinically significant valvular disease, congestive heart failure, or dysrhythmias and normal functional status for her age ([Tr. 396-98; 504, 540]). Further, an echocardiography report revealed normal left ventricular size and function, normal left ventricular wall thickness, and normal diastolic filling pattern for her age ([Tr. 391-93]). Finally, chest x-ray revealed no radiographic evidence of active disease in the claimant's chest ([Tr. 698]).

(Tr. 32) Further, Molina testified that her hernias had been surgically repaired in March 2015 and she did not have any hernias at the time of the hearing. (Tr. 52-52-53) Substantial evidence supports the ALJ's determination that Molina's cardiac and alleged abdominal and intestinal

---

it. However, it stands to reason that the ALJ was aware Molina's condition had improved following her hernia repair surgery from his citation of Molina's lack of recent disabling abdominal problems. (See, e.g., Tr. 32)

17

problems did not prevent her from being able to lift and carry ten pounds or work at the sedentary level as limited in the ALJ's RFC.

Molina has not identified any harmful errors in the ALJ's decision. I recommend the court reject Molina's arguments and affirm the commissioner's decision.

## VI. Recommendation

Because substantial evidence supported the ALJ's RFC determination, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: May 31, 2018

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).